## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | |
|---|---|
| ESTATE OF SARAH R. SEYBOLD, by LESLIE HACKER, as Personal Representative of the Estate, and on behalf of the Survivors,<br><br>    Plaintiff,<br><br>v.<br><br>TAZEWELL COUNTY, TAZEWELL COUNTY SHERIFF JEFFREY LOWER, WELLPATH (f/k/a Correct Care Solutions): H.I.G. CAPITAL, LLC, HANNAH WILLIAMSON, MARISSA HUTTON, BRYCE COLVIN, AARON HOFFMAN, KARA TOEL, in their individual capacities,<br><br>    Defendants. | CASE NO.  20-CV-1386 |

## COMPLAINT

Plaintiff sues Defendants and alleges:

## Introduction

1. On November 10, 2019, Sarah R. Seybold died while isolated in a cell in the Tazewell County Jail. Ms. Seybold was only 41 years old.

2. Ms. Seybold was not the first inmate to die in the Tazewell County Jail as a result of the staff's failure to render aid to individuals suffering from drug overdose or withdrawal. Prompt and proper medical attention for this illness could have prevented these deaths.

3. Defendants JEFFREY LOWER and WELLPATH failed to implement any meaningful training or provide continuing education to their employees that focused on the signs, symptoms and consequences of drug intoxication and/or withdrawal of detainees being

1

processed into the Tazewell County Jail. In fact, in another inmate death case at the Tazewell County Jail, *Estate of Jerad Traylor v. Tazewell County, et. al*., 18-CV-1309, a Jail Operations Supervisor testified under oath that he was not properly trained regarding drug withdrawal and that he raised it with command staff but never received a response or additional training.

4.    Prior to her death, Ms. Seybold was displaying classic signs of drug overdose. In fact, Defendant HUTTON found a torn plastic baggie in Ms. Seybold's clothing when she was processing her into the jail, indicating recent drug consumption.

5.    The arresting officers informed Defendant HUTTON that Ms. Seybold had been shaking and has used the bathroom twice when she was at the police station.

6.    During the processing, Defendant WILLIAMSON checked Ms. Seybold's vitals. Defendant WILLIAMSON still accepted Ms. Seybold into the jail and failed to recognize Ms. Seybold needed a higher level of emergency care.

7.    Under Tazewell County Jail Policy 502.3.1, Ms. Seybold should have been examined by a qualified physician prior to admittance to the Jail.

8.    Defendant WILLIAMSON is not a physician or even a registered nurse.

9.    Under Tazewell County Jail Policy 709.4, Ms. Seybold should have been referred to a medical facility for a medical clearance prior to admittance to the Jail.

10.    Although Ms. Seybold was clearly displaying signs of drug intoxication, she was never sent to the hospital to receive proper treatment. The correctional officers and medical staff agreed to accept Ms. Seybold into the Jail although she was clearly suffering from drug intoxication.

**Jurisdiction and Venue**

11.   This Court has jurisdiction over this matter under the following:

    a.   28 U.S.C. § 1331, as this is a civil action arising under the Constitution, laws, and/or treaties of the United States;

    b.   28 U.S.C. § 1337, as this is a civil action or proceeding arising under an Act of Congress regulating commerce and/or protecting trade and commerce against restraints and monopolies; and

    c.   28 U.S.C. § 1343, as this is a civil action seeking to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom and/or usage, of a right, privilege or immunity secured by the Constitution of the United States and/or by an Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

12.    Plaintiff's claims for relief are predicated, in part, upon 42 U.S.C. § 1983, which authorizes actions to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the Constitution and laws of the United States, and upon 42 U.S.C. § 1988, which authorizes the award of attorneys' fees and costs to prevailing plaintiffs in actions pursuant to 42 U.S.C. § 1983.

13.   Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367, to consider the state law claims alleged herein.

14.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and § 1391(c), as Defendants do business in this judicial district and the events or omissions giving rise to the claims occurred in this judicial district.

## Parties

15. Plaintiff LESLIE HACKER is the duly appointed Personal Representative of the Estate of Sarah R. Seybold, having been appointed Personal Representative by the Probate Division of the Circuit Court of The Tenth Judicial Circuit, Peoria County, in Case No. 20-P-278. This action is brought by LESLIE HACKER, mother of Sarah R. Seybold, in her capacity as Personal Representative of the Estate of Sarah R. Seybold, on behalf of the Estate of Sarah R. Seybold, and on behalf of survivors.

16. At times material to this action, Sarah R. Seybold, Plaintiff's decedent, was a pre-trial detainee confined in Tazewell County Jail, Pekin, Illinois, a correctional facility maintained by Defendant JEFFREY LOWER ("Defendant LOWER").

17. At all relevant times, Defendant LOWER was the duly elected sheriff of Tazewell County and chief administrator of the Tazewell County Jail.  At all relevant times, he was acting under color of law and in the course and scope of his employment as the agent, servant, and an official policy maker for Defendant TAZEWELL COUNTY on issues relating to care of prisoners in Tazewell County Jail and the policies, procedures, practices, and customs, as well as the acts and omissions, challenged by this suit, and as the County's chief law enforcement officer. Defendant LOWER was the commanding officer of all Tazewell County sheriff's deputies, correctional officers, and jail employees, and he was responsible for their training, supervision, and conduct. Defendant LOWER failed to adequately monitor the administration of the contract with WELLPATH even though he had been repeatedly alerted to their pattern of unconstitutional conduct and knew that the Jail had become unsafe for those with mental health/addictions needs like Sarah R. Seybold. He is sued in his official capacity.

18.  Defendant TAZEWELL COUNTY is joined in this action pursuant to *Carver v. Sheriff of LaSalle County*, 324 F.3d 947 (7ᵗʰ Cir. 2003).

19.  At all material times, WELLPATH was and is owned and controlled by H.I.G. Capital. WELLPATH acts on behalf of H.I.G, and was and is responsible for the hiring, retaining, training, and supervising of the conduct, policies and practices of its employees and agents of the WELLPATH.

20.  Defendant H.I.G. CAPITAL LLC, ("H.I.G.") is a private equity firm doing business in TAZEWELL COUNTY through WELLPATH.

21.  H.I.G. acquired Correct Care Solutions ("CCS") and other private correctional health care providers and rebranded as WELLPATH. H.I.G. is the owner, manager and partner of CCS (now known as WELLPATH ), which is employed to provide delivery of medical services to detainees, such as Sarah R. Seybold. It was and is responsible for the management, hiring, retaining, training, and supervising of the conduct, policies and practices, customs, standards, and finances, of its employees, managers, supervisors, contractors, and leaders, including Defendant HANNAH WILLIAMSON, in the service of providing medical care to prisoners.

22.  WELLPATH executives, directors, supervisors and managers, physicians, nurses, and mental health providers act on behalf of H.I.G. and WELLPATH. H.I.G. is the alter ego of WELLPATH, and/or alternatively WELLPATH acts on behalf of H.I.G. which has control over WELLPATH.

23.  H.I.G. accomplishes this inter alia, by placing its in-house professional services and expertise as board members of WELLPATH to ensure their control over WELLPATH. There is unity of interest and ownership such that the separate personalities of H.IG. and

WELLPATH  no longer exist as WELLPATH and their employees and agents act with the consent, management, approval, ratification and direction of H.I.G.

24.    Before acquiring CCS through joining other correctional healthcare companies, and renaming them WELLPATH, H.I.G. knew or should have known of the pervasive unconstitutional conduct of these companies. H.I.G. knew this and acquired this information through performing due diligence analysis prior to acquiring CCS. It made the decision that providing mental health care in jails was a financially lucrative business to acquire, control and manage, and have adjusted their private equity fund investments and operational structure to capitalize on sick and mentally ill prisoners in jail systems across the Country. H.I.G.'s use of WELLPATH is but a mere shell, an instrumentality or conduit for the business of financially profiting from providing mental/medical care to detainees in jails through these shell companies.

25.    On October 1, 2018, H.I.G. announced that it acquired CCS and merged it with Correctional Medical Group Companies (CMGC).

26.    H.I.G. renamed CCS-CMGC "WELLPATH" in October 2018, for the purpose of carrying H.I.G.'s ownership and financial interests in providing jail mental and medical health care and so H.I.G. controls the assets and financial gains while CFMG as WELLPATH assume the liabilities. WELLPATH is H.I.G.'s 23rd controlled investment in healthcare since 2008 and is its 14th current platform in the sector. WELLPATH is estimated to generate $1.5 billion annually.[1]

27.    In October 1, 2018, H.I.G. publicly announced that "[o]ver the years, as the country's

---

[1] HIG Capital, "Correct Care Solutions and Correctional Medical Group Companies Join Forces to Deliver Best-in-Class Healthcare." HIG CAPITAL NEWS, October 1, 2018, available at https://higcapital.com/news/release/1128.

health care system has changed we have seen more and more individuals with acute
mental health diagnosis and substance use disorders being treated by our doctors, nurses
and clinicians in correctional settings."

28. A Managing Director of H.I.G. announced, "We are proud of what we have
accomplished since partnering with CMGC in 2012, and excited to bring these two
companies together."

29. H.I.G. and H.I.G. Defendants knew that behavioral and mental healthcare, in particular,
located in state and federal correctional facilities or civil commitment centers have
become repositories particularly for the vulnerable mentally ill population growing across
the United States and they decided to capitalize on this vulnerable population.

30. H.I.G. uses the corporate entity as a shield against personal liability and harm caused to
inmates in jails. Recognition of H.I.G. as a separate corporate entity would
promote injustice and defeat the rights and equities of persons such Sarah R. Seybold
and Plaintiffs; it would enable and facilitate CCS/WELLPATH and H.I.G'.s
unconstitutional conduct, practices, customs and policies, actions and inactions that harm
this particularly vulnerable jail population and discourage abatement of these
unconstitutional actions and inactions

31. H.I.G. exercises sufficient control over CCS now WELLPATH's activities such that
CCS/WELLPATH is a mere agent of instrumentality of H.I.G.

32. WELLPATH (owned by H.I.G.), on information and belief with approval of H.I.G.,
entered into a contact with TAZEWELL COUNTY to provide medical and mental health
services of those incarcerated and detained at the Tazewell County Jail.

33. Defendant WELLPATH was acting on behalf of H.I.G. and was and is an agent of H.I.G.

and therefore H.I.G. is responsible for WELLPATH's conduct as described in this Complaint.

34. H.I.G. exercises sufficient control over WELLPATH's activities such that WELLPATH is a mere agent or instrumentality of H.I.G.

35. H.I.G. places its senior partner and/or members on the boards or managing bodies of WELLPATH in order to maintain a high degree of day-to-day control over WELLPATH's activities.

36. H.I.G. has seats on the board of WELLPATH and controls, manages, and approves major policy decisions of WELLPATH.

37. At times material to this complaint, Defendant, HANNAH WILLIAMSON ("Defendant WILLIAMSON") was a nurse who was responsible for patient health care at the Tazewell County Jail. Defendant WILLIAMSON was responsible for carrying out the policies and procedures for health care then in effect at the Tazewell County Jail and for the timely response to the medical care needs of detainees occurring and coming to her attention. At all times material to this action, Sarah R. Seybold was a detainee subject to the care and treatment of Defendant WILLIAMSON. Defendant WILLIAMSON is an employee of Defendant WELLPATH.

38. At times material to this complaint, Defendant MARISSA HUTTON ("Defendant HUTTON") was a correctional officer in the Tazewell County Jail who was responsible for the well-being and safety of detainees, including making sure detainees were medically sound to be booked into the Jail. At all times material to this action, Sarah R. Seybold was a detainee subjected to the care, custody, and control of Defendant HUTTON while she was housed in the Jail. Defendant HUTTON is employed by

Tazewell County.

39.    At times material to this complaint, Defendant BRYCE COLVIN ("Defendant COLVIN") was a correctional officer in the Tazewell County Jail who was responsible for the well-being and safety of detainees, including making sure detainees were medically sound to be booked into the Jail. At all times material to this action, Sarah R. Seybold was a detainee subjected to the care, custody, and control of Defendant COLVIN while she was housed in the Jail. Defendant COLVIN is employed by Tazewell County.

40.    At times material to this complaint, Defendant AARON HOFFMAN ("Defendant HOFFMAN") was a correctional officer in the Tazewell County Jail who was responsible for the well-being and safety of detainees, including making sure detainees were medically sound to be booked into the Jail. At all times material to this action, Sarah R. Seybold was a detainee subjected to the care, custody, and control of Defendant HOFFMAN while she was housed in the Jail. Defendant HOFFMAN is employed by Tazewell County.

41.    At times material to this complaint, Defendant KARA TOEL ("Defendant TOEL") was a correctional officer in the Tazewell County Jail who was responsible for the well- being and safety of detainees, including making sure detainees were medically sound to be booked into the Jail. At all times material to this action, Sarah R. Seybold was a detainee subjected to the care, custody, and control of Defendant TOEL while she was housed in the Jail. Defendant TOEL is employed by Tazewell County.

**Common Allegations of Fact**

42.  On or about November 10, 2019, at approximately 9:50 a.m., Sarah R. Seybold was transported to the Tazewell County Jail after an arrest. She was 41 years of age.

43.  Upon her arrival at the sally port of the Jail, Ms. Seybold was shaking and could barely speak.

44.  Ms. Seybold told Defendant HUTTON that she consumed narcotics the day prior.

45.  During a search of her person, Defendant HUTTON found a plastic baggie that had the corner torn out.

46.  The arresting officers told Defendant HUTTON that Ms. Seybold was just arrested for possession of prescription pills and had been shaking.

47.  The arresting officers asked Ms. Seybold if she swallowed anything out of that bag. Ms. Seybold grunted, and Defendant HUTTON responded with a look of indifference to the officer.

48.  During the processing, Defendant HUTTON had to assist Ms. Seybold from removing a hair tie from her hair as her hands were shaking so badly and had to grab Ms. Seybold by the arm to prevent her from falling over.

49.  Defendant WILLIAMSON was called out to the sally port to take Ms. Seybold's vitals.

50.  Defendants HUTTON and WILLIAMSON agreed to accept Ms. Seybold into the Jail in the condition she presented.

51.  Upon entry into the Jail, Ms. Seybold was eventually placed in A Pod. The cell that Ms. Seybold was placed in was under video surveillance. This is a single person cell.

52.  The decision to isolate Ms. Seybold in a single cell followed the policy and practice of LOWER and WELLPATH to remove inmates undergoing potential medical emergencies,

including drug or alcohol overdoses, from the facility's general population, and not provide them adequate medical assessment and monitoring.

53. During her time in that cell, upon information and belief, Defendant WILLIAMSON checked on Ms. Seybold. Defendant WILLIAMSON ignored the clear signs of drug overdose that Ms. Seybold was exhibiting.

54. Overdosing on amphetamines and/or methamphetamines can be fatal.

55. Immediate medical care can save someone undergoing an overdose of amphetamines and/or methamphetamines, and earlier treatment increases the chance of survival.

56. While Ms. Seybold was in that cell, Defendants COLVIN, HOFFMAN and TOEL also monitored her and also failed to get her immediate emergency medical care while she was clearly suffering from a drug overdose.

57. Defendants LOWER, WELLPATH and H.I.G. do not maintain 24-hour medical personal on site at the jail.

58. Prior to leaving for the day, Defendants WILLIAMSON, COLVIN, HOFFMAN and TOEL should have provided emergency medical attention by sending Ms. Seybold to the hospital instead of leaving her in an isolation cell without any medical monitoring, assessment or treatment.

59. At one point during the evening, Defendants COLVIN, HOFFMAN and TOEL found Ms. Seybold falling in her cell. Instead of taking Ms. Seybold to get a higher level of medical care, they placed mats on the floor of her cell to break her fall if she fell again.

60. At approximately 6:03 p.m., Ms. Seybold told Defendants COLVIN, HOFFMAN and TOEL that she had consumed meth, heroin and THC balls. At this time she was severely twitching.

61. Ms. Seybold was twitching so bad that Defendant HOFFMAN was unable to take her vitals.

62. At approximately 6:53 p.m., Ms. Seybold stopped making any observable movements in her cell.

63. Jail staff did not discover that Ms. Seybold was unresponsive until 8:15 p.m.

64. Ms. Seybold was pronounced dead at Pekin Hospital.

65. Her cause of death was determined to be methamphetamine intoxication. The forensic pathologist that performed the autopsy indicated that hours passed between the onset and the time of death.

66. All Defendants knew that Ms. Seybold, as a detainee in the Tazewell County Jail custody, had no other treatment options, and that if they (WELLPATH and the Tazewell Defendants) failed to provide adequate treatment, she could access no other treatment.

67. It would have been obvious to anyone, including individuals with no medical training, that Ms. Seybold's serious medical needs were not being met by WELLPATH and its personnel.

68. At times material hereto, Defendant LOWER and TAZEWELL COUNTY employees and agents acting on his behalf, acted within the scope of their employment and under color of state law.

69. At all times material hereto, Defendant LOWER conducted regular audits and received reports on conditions at the Tazewell County Jail. Therefore, Defendant LOWER was well aware that detainees, including Ms. Seybold, were not receiving minimally adequate medical care while incarcerated in the Tazewell County Jail.

70.  Defendant LOWER was aware there was not sufficient medical staff at the Tazewell
     County Jail to address the health care needs of the detainees incarcerated at the Jail.

71.  Defendant LOWER had heavily participated in budget plans that left medical needs unmet
     for inmates like Ms. Seybold.

72.  Defendant LOWER was aware that correctional staff were untrained and prone to ignore
     medical problems, frequently causing harm to inmates in their care.

73.  At all times material, Defendant LOWER knew that the training given to correctional staff
     did not sufficiently provide the staff necessary information regarding the right of detainees
     such as Plaintiff's decedent to be kept safe and provided with proper medical care.

74.  The staff's training was inadequate and insufficient to properly provide appropriate
     guidelines and job standards for proper performance of their job in a manner sufficient to
     meet the needs of Plaintiff's decedent.

75.  As a direct and proximate result of Defendants' acts and omissions, Sarah R. Seybold died
     in her cell on November 10, 2019.

76.  Plaintiff has had to retain counsel and is entitled to reimbursement of a reasonable
     attorneys' fees, pursuant to 42 USC §1988.


## Causes of Action:

### I.      Claims under 42 U.S.C. 1983: LOWER

77.  Plaintiff re-alleges the Common Allegations of Fact as if fully set forth herein.

78.  Plaintiff is entitled to relief against Defendant LOWER under 42 U.S.C. § 1983, based on
     violation of the Fourteenth Amendment to the U.S. Constitution.

79. At all times material, Plaintiff's decedent, Sarah R. Seybold, had a constitutionally protected right under the Fourteenth Amendment to the U.S. Constitution to receive needed care while in the Tazewell County Jail, and to have her medical and mental health issues timely and properly assessed and treated.

80. Defendant LOWER deliberately disregarded the immediate and serious threat to the mental and medical health and well-being of persons in the Tazewell County Jail and exhibited deliberate and callous indifference to serious medical and mental health needs, by denying access to intensive and structured medical health care, treatment and observation necessary to treat serious medical needs and prevent suffering and death.

81. Defendant LOWER was well aware that there were detainees confined in the Tazewell County Jail who suffered from severe medical health needs and were at risk of injury and/or death. Despite this knowledge, Defendant LOWER intentionally and knowingly failed to provide serious, ongoing case management and treatment for such inmates and failed to regularly monitor their medical health care needs.

82. Defendant LOWER knew at all times material to this action that there was a substantial risk that detainees with serious medical issues, left substantially untreated, could die, that such deaths were reasonably foreseeable, and that the threat of this was imminent and immediate.

83. Defendant LOWER deliberately disregarded the immediate and serious threat to detainees' medical health and well-being and exhibited deliberate indifference to their serious medical and psychological needs by denying and unreasonably delaying access to competent medical care to treat their serious medical needs, in that:

   a. with full knowledge of prior in custody deaths, and that failing to provide adequate

14

medical care to detainees with serious medical issues could die were reasonably
foreseeable, Defendant LOWER simply failed to provide needed care and attention;

   b.  with full knowledge of detainees with histories of serious medical issues, Defendant
       LOWER's actions in failing to provide close observation and adequate medical care
       by trained medical professionals was so grossly substandard, incompetent, and
       inadequate as to fairly be characterized as medical and mental health care so cursory as
       to amount to no medical and mental health care at all.

84.  In light of the aforementioned, Ms. Seybold suffered from both an objectively and
     subjectively substantial risk of serious harm while under the care and custody of Defendant
     LOWER. Defendant LOWER reacted to this risk in an objectively and subjectively
     unreasonable manner.

85.  It is more likely than not that the failures of Defendant LOWER as alleged above were the
     cause of Ms. Seybold's death.

86.  As a result of Defendant LOWER's disregard of and indifference to Ms. Seybold's
     constitutionally protected right to be provided with proper care, Ms. Seybold's medical
     needs were ignored.

87.  As a direct and proximate result of Defendant LOWER's deliberate indifference to Ms.
     Seybold's serious health needs, Ms. Seybold died from complications of serious medical
     issues on November 10, 2019.

WHEREFORE, Plaintiff prays for judgment as noted below.


## II.   Claims under 42 U.S.C. 1983: HUTTON, WILLIAMSON, COLVIN, HOFFMAN and TOEL

88.  Plaintiff re-alleges the Common Allegations of Fact as if fully set forth herein.

15

89. Plaintiff is entitled to relief against Defendants HUTTON, WILLIAMSON, COLVIN, HOFFMAN and TOEL under 42 U.S.C. § 1983, based on violation of the Fourteenth Amendment to the U.S. Constitution.

90. At all times material, Plaintiff's decedent, Ms. Seybold, had a constitutionally protected right under the Fourteenth Amendment to the U.S. Constitution to receive needed care while in the Tazewell County Jail, and to have her serious medical issues timely and properly assessed and treated.

91. Defendants HUTTON, WILLIAMSON, COLVIN, HOFFMAN and TOEL deliberately disregarded the immediate and serious threat to the mental health and well-being of persons in the Tazewell County Jail in need of medical treatment and exhibited deliberate and callous indifference to serious medical and mental health needs, by denying access to intensive and structured medical care, treatment and observation necessary to treat serious medical needs and prevent suffering and death.

92. Defendants HUTTON, WILLIAMSON, COLVIN, HOFFMAN and TOEL were well aware of the facts that there were inmates who suffered from severe medical needs and were at risk of injury and/or death. Despite this knowledge, Defendants HUTTON, WILLIAMSON, COLVIN, HOFFMAN and TOEL intentionally and knowingly failed to provide serious, ongoing case management and treatment for such inmates and failed to regularly monitor their medical health care needs.

93. Defendants HUTTON, WILLIAMSON, COLVIN, HOFFMAN and TOEL knew at all times material to this action that there was a substantial risk that detainees with serious medical issues, left substantially untreated, could be seriously injured and/or die, that such injuries and/or deaths were reasonably foreseeable, and that the threat injuries and/or death

16

was imminent and immediate.

94.   Defendants HUTTON, WILLIAMSON, COLVIN, HOFFMAN and TOEL deliberately disregarded the immediate and serious threat to detainees' medical health and well-being and exhibited deliberate indifference and callous indifference to their serious medical and psychological needs by denying and unreasonably delaying access to competent mental health care to treat their serious medical issues.

95.   In light of the aforementioned, Ms. Seybold suffered from both an objectively and subjectively substantial risk of serious harm while under the care and custody of HUTTON, WILLIAMSON, COLVIN, HOFFMAN and TOEL.

96.   Defendants HUTTON, WILLIAMSON, COLVIN, HOFFMAN and TOEL reacted to this risk in an objectively and subjectively unreasonable manner.

97.   It is more likely than not that the failures of Defendants HUTTON,  WILLIAMSON, COLVIN, HOFFMAN and TOEL as alleged above were the cause of Ms. Seybold's death.

98.   As a direct and proximate result of Defendants HUTTON, WILLIAMSON, COLVIN, HOFFMAN and TOEL's deliberate indifference to Ms. Seybold's serious medical needs, Ms. Seybold died on November 10, 2019

WHEREFORE, Plaintiff prays for judgment as noted below.

### III.    *Monell* Claim: WELLPATH and H.I.G.

99.   The violations of Sarah R. Seybold's constitutional rights under the Fourteenth Amendment to the United States Constitution, her damages and the conduct of the individual defendants, were directly and proximately caused by the actions and/or inactions of WELLPATH, which has, with deliberate indifference:

a)       failed to establish and/or implement policies, practices and procedures

to ensure that detainees at the Tazewell County Jail receive appropriate medical care for serious medical needs, and if necessary, health care services outside the jail. Specifically, it was a widespread practice and/or official policy at the Tazewell County Jail not to contact emergency medical services on behalf of an inmate who is experiencing an obvious medical emergency without the prior approval of WELLPATH, even where such approval was wrongfully withheld or denied;

b)  failed to establish and/or implement policies, practices and procedures to ensure that detainees at the Tazewell County Jail receive appropriate medical care for serious medical and mental health needs; more specifically failing to send individuals experiencing drug overdose or withdraw to the hospital;

c)  failed to adequately assess and provide adequate care and treatment for inmates who exhibiting signs of bizarre behavior;

d)  failed to adequately monitor the deteriorating mental and medical health conditions of inmates;

e)  failed to ensure through training, supervision and discipline that medical staff at the Tazewell County Jail, in necessary circumstances, make a referral for health care services outside the Jail;

f)  failed to ensure through training, supervision and discipline that correctional and medical staff adequately communicate and document inmates' deteriorating mental and medical health conditions;

g)  failed to ensure through training, supervision and discipline that

18

      correctional and medical staff properly respond to inmates' deteriorating

      mental and medial health conditions;

h)     failed to contract for medical and mental and medical health services in a manner

      so that financial incentives would not affect referring inmates for health

      care services outside the Jail;

i)      possessed knowledge of deficiencies in the policies, practices, customs

      and procedures concerning inmates, and approved and/or deliberately

      turned a blind eye to these deficiencies.

WHEREFORE, Plaintiff prays for judgment as noted below.

## IV.    State Claim for Wrongful Death: LOWER

100.   Plaintiff re-alleges the Common Allegations of Fact as if fully set forth herein.

101.   Ms. Seybold was survived by her mother, LESLIE HACKER, Ethan Hacker, and C.H.,

      whom constitute her heirs under Illinois law.

102.   Decedent Sarah R. Seybold was officially pronounced dead on November 10, 2019.

103.   The wrongful death of Ms. Seybold was proximately caused by the neglect, default,

      and/or willful and wanton conduct of the Defendants, as described above, in violation of

      740 ILCS § 180/1.

104.   TAZEWELL COUNTY and LOWER's employees, HUTTON, COLVIN,  HOFFMAN

      and TOEL, failed to properly monitor and/or report the declining health of Ms.

      Seybold

105.   The TAZEWELL COUNTY and LOWER Defendants' wrongful conduct was the direct

      and proximate cause of injury and damage to Ms. Seybold and her estate.

106.   As next of kin, the heirs of Ms. Seybold have lost and will continue to lose pecuniary

support, consortium, society, companionship as well as the love and affection of their

cherished daughter have incurred funeral and burial experiences as a proximate result of

her wrongful death.

WHEREFORE, Plaintiff prays for judgment as noted below.

### V.    State Claim for Wrongful Death: WELLPATH and H.I.G.

107. Plaintiff re-alleges the Common Allegations of Fact as if fully set forth herein.

108. Sarah R. Seybold is survived by LESLIE HACKER, Ethan Hacker, and C.H, whom

constitute her heirs under Illinois law.

109. Decedent Sarah R. Seybold was officially pronounced dead on November 10, 2019.

110. The WELLPATH Defendants had a duty to Ms. Seybold to exercise reasonable care

according to the conditions known to them or that, through reasonable care that should

have been known to them, in accordance with the standards of care in the community of

social workers.

111. The WELLPATH Defendants breached their duty to Ms. Seybold to exercise reasonable

care according to the conditions known to them or that, through reasonable care should

have been known to them, in accordance with the standards of care in their respective

professional communities.

112. WELLPATH Defendant WILLIAMSON had a duty to adequately evaluate and document

Ms. Seybold's medical and mental health needs and to refer her for medical and psychiatric

evaluation and treatment each time she observed that her needs were not otherwise being

met.

113. WELLPATH Defendant WILLIAMSON saw Ms. Seybold on November 10, 2019, and

failed to adequately evaluate and document Ms. Seybold's medical needs.

114. WELLPATH Defendant HANNAH WILLIAMSON failed to examine Ms. Seybold on November 10, 2019 as her medical health was quickly deteriorating.

115. On information and belief, WELLPATH Defendant WILLIAMSON never sought supervision or guidance for decedent's life-threatening situation.

116. WELLPATH was negligent and deviated from the standard of care in one or more of the following respects:

      a.    Although Ms. Seybold objectively suffered from a serious medical issue, WELLPATH employees failed to adequately intervene and determine that a health emergency existed;

      b.    WELLPATH employees failed to properly diagnose and treat Ms. Seybold's serious medical health issues; and

      c.    WELLPATH failed to properly staff the facility.

117. The injuries and death suffered by Ms. Seybold were proximately caused by the negligence, breach of duty of the standard of care, neglect, default, and/or willful and wanton conduct of the WELLPATH Defendants, as described above, in violation of 740 ILCS § 180/1.

118. The WELLPATH Defendants' negligent and wrongful conduct was the direct and proximate cause of injury and damage to Ms. Seybold and her estate.

119. As next of kin, the heirs of Ms. Seybold have lost and will continue to lose, consortium, society, companionship as well as the love and affection of their cherished daughter and have incurred funeral and burial experiences as a proximate result of his wrongful death.

WHEREFORE, Plaintiff prays for judgment as noted below.

**VI.**     **State Claim for Negligent Supervision, Training, Hiring and Retention:**

**LOWER , WELLPATH and H.I.G.**

120.   Plaintiff re-alleges the Common Allegations of Fact as if fully set forth herein.

121.   Defendants have a duty to hire, supervise, train and retain employees and/or agents so that employees and/or agents refrain from the conduct and/or omissions alleged herein.

122.   These general duties of reasonable care and due care owed to Plaintiffs by Defendants include but are not limited to the following specific obligations:

     a.     To properly and reasonably hire, supervise, train, retain, investigate, monitor, evaluate, and discipline each person (i) who was responsible for providing care for Ms. Seybold; (ii) who was responsible for the safe and appropriate Jail custody of Ms. Seybold; (iii) who was responsible for properly and reasonably accepting into the Jail and monitoring Ms. Seybold; (iv) who denied Ms. Seybold medical attention or access to medical care and treatment; and/or (vi) who failed to summon necessary and appropriate medical care;

     b.     To properly and adequately hire, supervise, train, retain, investigate, monitor, evaluate, and discipline their employees, agents, and/or law enforcement officers to ensure that those employees/agents/officers act at all times in the public interest and in conformance with law;

     c.     To make, enforce, and at all times act in conformance with policies and customs that are lawful and protective of individual rights, including Plaintiffs' rights.

d.   To refrain from making, enforcing, and/or tolerating the wrongful policies and customs set forth herein.

123.   Defendants breached this duty, causing the conduct alleged herein. Such breach constituted negligent hiring, supervision, training, and retention under the laws of the State of Illinois.

124.   As a direct and proximate result of Defendants' failure, Ms. Seybold and Plaintiffs suffered injuries and damages as alleged herein.

**Damages**

A.  The Estate of Sarah R. Seybold has sustained the following damages:

1.   funeral and burial expenses incurred as a result of decedent's death that have become a charge against her Estate or that were paid on her behalf;

2.   loss of prospective net Estate accumulations;

3.   decedent's conscious pain and suffering and the inherent value of life;

4.   pre- and post-judgment interest; and

5.   loss of earnings of Ms. Seybold from the date of her death, less lost support of her survivors excluding contributions in kind with interest.

Accordingly, Plaintiff respectfully requests that the Court award Plaintiff the aforementioned damages; any and all other compensatory damages suffered by Plaintiff; punitive damages; attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and such other and further relief as the Court deems just and equitable.

**Prayer for Relief**

WHEREFORE, the Plaintiffs seek judgment as follows:

A.    Compensatory damages against each of the Defendants herein;

B.    Punitive damages against Defendants sued individually;

C.    Attorneys' fees pursuant to 42 U.S.C. § 1988 and costs of litigation;

D.    A trial by jury on all issues so triable;

E.    Such further relief as the Court deems just and proper.


                                                                                 Respectfully Submitted,

                                                                                 *s/Louis J. Meyer*
                                                                                 Louis J. Meyer
                                                                                 MEYER & KISS, LLC
                                                                                 311 West Stratford Drive
                                                                                 Peoria, Illinois 61614
                                                                                 t. 309.713.3751
                                                                                 f. 312.765.0104
                                                                                 e. [louismeyer@meyerkiss.com](mailto:louismeyer@meyerkiss.com)