## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

ESTATE OF SARAH R. SEYBOLD,  )
by LIBERTY BINEGAR,  )
as Personal Representative of the Estate,  )
and on Behalf of the Survivors,  )
   )
       Plaintiff,  )
   )
       v.  )   Case No. 20-cv-1386-JES-JEH
   )
TAZEWELL COUNTY, TAZEWELL  )
COUNTY SHERIFF JEFFREY LOWER,  )
WELLPATH (f/k/a Correct Care Solutions),  )
H.I.G. CAPITAL, LLC, HANNAH  )
WILLIAMSON, MARISSA HUTTON,  )
BRYCE COLVIN, AARON HOFFMAN, and )
KARA TOEL, in their individual capacities,  )
   )
       Defendants.  )

### ORDER AND OPINION

This matter is now before the Court on Defendant H.I.G. Capital, LLC's ("HIG") Motion (Doc. 21) to Dismiss for Failure to State a Claim, Plaintiff's Response (Doc. 30), and Defendant's Reply (Doc. 33); Defendant Jeffrey Lower's Motion (Doc. 23) to Dismiss Part of Count VI, and Plaintiff's Response (Doc. 28); and Defendant Wellpath's (f/k/a Correct Care Solutions LLC) Partial Motion (Doc. 24) to Dismiss for Failure to State a Claim and Plaintiff's Response (Doc. 29). For the reasons set forth below, HIG's Motion (Doc. 21) is GRANTED, Lower's Motion (Doc. 23) is GRANTED, and Wellpath's Motion (Doc. 24) is DENIED.

### BACKGROUND

The following facts are taken from Plaintiff's Complaint, which the Court accepts as true for the purposes of a motion to dismiss. *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 639 (7th Cir. 2015).

### A.  Ms. Seybold's Death at the Tazewell County Jail

On November 10, 2019, Sarah Seybold was arrested for possession of prescription pills. Doc. 1, ¶ 46.[1]  Around 9:50 am, she was transported to the Tazewell County Jail ("Jail"). *Id.*, ¶ 42. Upon her arrival to the sally port at the Jail, Ms. Seybold was shaking and could barely speak. *Id.*, ¶ 43. The arresting officers told Defendant Marissa Hutton, a correctional officer at the Jail, why Ms. Seybold was arrested and that she had been shaking and used the bathroom twice at the police station. *Id.*, ¶¶ 5, 38, 46. Ms. Seybold told Hutton that she had consumed narcotics the day prior. *Id.*, ¶ 44. While searching Ms. Seybold, Hutton found a plastic baggie that had the corner torn out. *Id.*, ¶ 45. The arresting officers asked Ms. Seybold if she swallowed anything out of that bag. *Id.*, ¶ 47. Ms. Seybold grunted, and Hutton appeared indifferent. *Id.* While processing Ms. Seybold, Hutton had to assist her by removing a hair tie from Ms. Seybold's hair because her hands were shaking so badly. *Id.*, ¶ 48. Hutton also grabbed Ms. Seybold's arm to prevent her from falling over. *Id.* During this time, Defendant Hannah Williamson, a nurse employed by Defendant Wellpath who was responsible for patient health care at the Jail, was called out to the sally port to take Ms. Seybold's vitals. *Id.*, ¶¶ 37, 49.

After taking Ms. Seybold's vitals, Hutton and Williamson agreed to accept Ms. Seybold into the Jail. *Id.*, ¶ 50. After entering the Jail, Ms. Seybold was eventually placed in "A" Pod, which is single-person cell that was under video surveillance. *Id.*, ¶ 51. During her time in that cell, Williamson checked on Ms. Seybold but did not request emergency medical care for her. *Id.* Defendants Bryce Colvin, Aaron Hoffman, and Kara Toel, correctional officers at the Jail, also monitored Ms. Seybold but did not request emergency medical care. *Id.*, ¶¶ 39-56. The Jail does not have 24-hour medical personnel on site. *Id.*, ¶ 57. At one point, Colvin, Hoffman, and Toel

---

[1] Citations to the Docket in this case are abbreviated as "Doc. __."

found Ms. Seybold falling in her cell and placed mats on the floor of her cell to break her fall if she fell again. *Id.*, ¶ 59.

At approximately 6:03 p.m., Ms. Seybold was severely twitching. *Id.*, ¶ 60. She told Colvin, Hoffman, and Toel that she had consumed meth, heroin, and THC balls. *Id*. Ms. Seybold was twitching so severely that correctional officer Hoffman was unable to take her vitals. *Id.*, ¶ 61. By 6:53 p.m. on November 10, 2019, Ms. Seybold stopped making any observable movements in her cell. *Id.*, ¶ 62. However, the Jail staff did not discover that Ms. Seybold was unresponsive until 8:15 p.m. *Id.*, ¶ 63. That night Ms. Seybold was pronounced dead at the Pekin Hospital. *Id.*, ¶ 64. Her cause of death was determined to be methamphetamine intoxication. *Id.*, ¶ 65. The forensic pathologist that performed the autopsy also indicated that hours had passed between the onset and the time of death. *Id*.

### B.  Defendants Wellpath and HIG

Defendant Wellpath entered into a contract with the Jail to deliver medical and mental health services to detainees, which included Ms. Seybold. *Id.*, ¶¶ 21, 32. Wellpath is responsible for hiring, retaining, training, and supervising the conduct, policies, and practices of its employees and its agents, including Williamson when she provided medical care to detainees. *Id.*, ¶¶ 19, 21. Defendant HIG is a private equity firm. *Id.*, ¶¶ 20-21. The Complaint alleges HIG acquired Correct Care Solutions ("CCS") and other private correctional health care providers including Correctional Medical Group Companies ("CMGC") and rebranded them as "Wellpath." *Id.*, ¶¶ 20-21, 25-26.[2] Wellpath is H.I.G.'s 23rd controlled investment in healthcare since 2008 and is its 14th current platform in the sector. *Id.*, ¶ 26. Wellpath is estimated to

---

[2] However, the article Plaintiff cites in her Complaint to support this proposition states "one of HIG's affiliates" rather than HIG itself acquired CCS and merged it with CMGC. Doc. 1, ¶ 26 n.1; *see* HIG Capital, *Correct Care Solutions and Correctional Medical Group Companies Join Forces to Deliver Best-in-Class Healthcare*, (Oct. 1, 2018), https://higcapital.com/news/release/1128. The article does not address the new name of "Wellpath."

generate $1.5 billion annually. *Id*. As discussed in this Opinion, Plaintiff seeks to hold HIG liable for Wellpath's actions because of the level of control and/or ownership HIG is alleged to maintain over Wellpath. Doc. 30, at 6.

### C. Procedural Background

On November 6, 2020, Plaintiff filed a five-count Complaint against nine Defendants, which included the following: Title 42 U.S.C. § 1983 claims against Sheriff Lower and the individual Tazewell County officers (Count I) and the Wellpath nurse (Count II) based on Fourteenth Amendment violations; *Monell* claims against Wellpath and HIG (Count III) based on Fourteenth Amendment violations; state law wrongful death claims against Sheriff Lower (Count IV), and Wellpath and HIG (Count V); and state law claims for negligent supervision, training, hiring, and retention against Sheriff Lower, Wellpath, and HIG (Count VI). Doc. 1. The Complaint generally alleges Defendants repeatedly ignored the classic signs of drug withdrawal or overdose that Ms. Seybold was displaying. *Id.*, ¶¶ 2-4. Rather than sending Ms. Seybold to the hospital for necessary emergency medical treatment, Defendants placed her in a single cell away from the general population without any medical assessment or monitoring. Defendants allegedly made this decision pursuant to the policies and/or practices of Defendants Wellpath and Sheriff Lower, who do not maintain 24-hour medical personnel on-site at the jail or provide proper medical education or training to the staff on-site when medical personnel are not present. *Id.*, ¶¶ 3, 52, 57.

Defendants Sheriff Jeffrey Lower, Wellpath, and HIG have filed motions to dismiss. Docs. 21, 23, 24. Defendants Tazewell County, the individual Tazewell County officers, Bryce Colvin, Aaron Hoffman, Marissa Hutton, Kara Toel, and Wellpath Nurse Hannah Williamson answered the complaint without moving to dismiss. Docs. 22; 25. Defendant Sheriff Jeffrey

Lower filed an answer in addition to his partial motion to dismiss. Doc. 22. Counts I and II are not at issue in any of the motions to dismiss.

## LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) challenges whether a complaint sufficiently states a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). The Court must accept well-pleaded allegations in a complaint as true and draws all permissible inferences in favor of the plaintiff. *See Bible*, 799 F.3d at 639. To survive a motion to dismiss, the complaint must describe the claim in sufficient detail to put the defendants on notice as to the nature of the claim and its bases, and it must plausibly suggest that the plaintiff has a right to relief. *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007). A complaint need not allege specific facts, but it may not rest entirely on conclusory statements or empty recitations of the elements of the cause of action. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

## DISCUSSION

From a review of the Complaint, it appears all of Plaintiff's claims will depend on facts elicited through discovery, including prior statements from the deceased, observations from the Jail staff, policies at the Jail and whether they were followed, and perhaps expert testimony on the prevalence of drug-related deaths among detainees and the appropriate standard of care for diagnosing and treating those detainees. For the reasons discussed below, all of Plaintiff's claims remain viable at this time except her claims specific to HIG and Defendant Sheriff Lower's liability for negligent hiring and retention as alleged in Count VI. The Court will discuss the three motions to dismiss in turn.

## I.      *Defendant Sheriff Lower's Motion*

Pursuant to Federal Rule of Civil Procedure 12(c), Defendant Sheriff Lower asks this Court to dismiss part of Count VI, which includes state law claims for negligent hiring and retention. Doc. 23, at 1. Sheriff Lower contends he is absolutely immune from liability for these claim under Section 2-201 of the Illinois Tort Immunity Act. *Id.* at 3-5 (discussing Illinois caselaw for support). In her Response, Plaintiff agrees with the language cited in Defendant's Motion and agrees to dismiss her claims for negligent hiring and negligent retention with prejudice. Doc. 28, at 1. The Parties have also agreed to bear their own costs regarding Sheriff Lower's Motion. *Id.* at 2. As such, because Plaintiff has agreed to drop these two claims, the Court need not address this issue. Sheriff Lower's unopposed Motion (Doc. 23) to Dismiss is granted. Thus, in Count VI, Plaintiff's causes of action for negligent hiring and retention are dismissed and the claims for negligent supervision and training shall remain at this time.

## II.     *Defendant Wellpath's Motion*

Plaintiff has brought three claims against Wellpath: a *Monell* claim (Count III), a state law wrongful death claim (Count V), and a state-law claim for negligent supervision, training, hiring, and retention (Count VI). Doc. 1. In its Motion, Wellpath seeks dismissal of the *Monell* claim in Count III and dismissal of the state law negligent hiring and retention portions of Count VI because Plaintiff has failed to plead plausible claims. Doc. 24, at 2. Thus, Count V and the portions of Count VI for negligent supervision and training are not at issue with respect to Wellpath. In her Response, Plaintiff asks this Count to deny Defendant's Motion or alternatively, grant Plaintiff leave to provide additional facts to support her claims and cure any pleading deficiencies. Doc. 29, at 2.

A. **Count III -** *Monell* **Claim**

In Count III, Plaintiff alleges Wellpath violated Ms. Seybold's constitutional rights under the Fourteenth Amendment through at least nine policies, practices, or customs, of which Wellpath either approved or consciously disregarded despite the known deficiencies within them. Doc. 1, ¶ 99. To state a *Monell* claim, Plaintiff must allege she "(1) suffered a deprivation of a federal right; (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policymaking authority; which (3) was the proximate cause of [her] injury." *McFields v. Dart*, 982 F.3d 511, 516 (7th Cir. 2020) (quoting *King v. Kramer*, 763 F.3d 635, 649 (7th Cir. 2014)). Wellpath attacks the sufficiency of the second element in this articulation of a *Monell* claim. Wellpath argues Plaintiff has failed to plausibly allege "final policymaking authority," an "express municipal policy," or a "widespread custom and practice" in order to state a claim for *Monell* liability. Doc. 24, at 3-5 (citing *McFields*, 982 F.3d at 516). Plaintiff's Response highlights that *Monell* claims are not held to a heightened pleading standard despite Wellpath's suggestion. Doc. 29, at 4. She further asserts that she has plausibly alleged *de facto* policies, a final policy maker, and widespread custom and practices, which deprived Ms. Seybold of her constitutional rights. *Id.* at 6-10.

Section 1983 claims are indeed not subject to any heightened pleading standard. *Latuszkin v. City of Chicago*, 250 F.3d 502, 504 (7th Cir. 2001) (citing *McCormick v. City of Chicago,* 230 F.3d 319, 323–24 (7th Cir. 2000)). Rather, a plaintiff must set forth sufficient allegations to provide notice of the "gravamen of the complaint" to the court and defendants and "raise a right to relief above the speculative level." *Id.*; *Twombly*, 550 U.S. at 555. Plaintiff has adequately done so here. Plaintiff lists various specific policies, practices, and customs under which Wellpath is alleged to have caused constitutional deprivations. Wellpath argues it cannot

be vicariously liable for Williamson's actions under *Monell*, which is true. Doc. 24, at 4. However, it is clear Plaintiff contends that Wellpath, rather rouge employees, was the driving force behind these actions or inactions. It is also clear the allegations indicate that individual Defendants, namely Williamson, followed unconstitutional policies set forth by Wellpath or Wellpath consciously disregarded these individuals' reckless actions. *See* Doc. 1, ¶ 99 (discussing failures to discipline, supervise, train, and implement adequate policies). As discussed below, the Court is not going to address the sufficiency of each *Monell* allegation but will provide examples as to its basis for finding Plaintiff has sufficiently pled a *Monell* claim.

Wellpath argues Plaintiff failed to allege enough facts because none of her nine listed theories involve an express policy; rather, she alleges conclusory allegations involving failures to establish appropriate or adequate medical care policies and inadequate training and supervision regarding medical care policies. Doc. 24, at 3 (citing Doc. 1, ¶¶ 99(a)-(i)). The Court disagrees. There are various theories based on policies and customs which are actionable under Section 1983 and Plaintiff provides sufficient notice of the grounds for *Monell* liability. Plaintiff has alleged various policies which led to Ms. Seybold's constitutional deprivation including a policy of not sending individuals experiencing drug overdose or withdrawal to the hospital and not appropriately assessing or providing treatment for inmates who exhibited signs of bizarre behavior, presumably like Ms. Seybold's. Doc. 1, ¶ 99(b)-(c). Plaintiff also alleges Wellpath allows financial incentives to affect whether inmates are referred for healthcare services outside the Jail. *Id.*, ¶ 99(h). These allegations present a story that Wellpath has a policy of ignoring obvious drug overdose or withdrawal signs for profit even though they know detainees are in need of these services, and this policy caused the death of Ms. Seybold.

Plaintiff also alleges there is a widespread practice at the Jail to not contact emergency

medical services on behalf of an inmate who is experiencing an obvious medical emergency

without the prior approval from Wellpath, even where such approval was wrongfully withheld or

denied. This allegation, along with the other language in Count III, is more than a mere

threadbare recital of the elements for a *Monell* claim. *Cf. e.g, Furstenau v. City of Naperville*, No.

07 C 6143, 2008 WL 5412872, at *4 (N.D. Ill. Dec. 23, 2008) (holding the plaintiff's mere

allegation that some unstated policy existed which caused a constitutional deprivation was bare,

conclusory, and insufficient to survive a 12(b)(6) motion). Rather, Plaintiff points to a specific

custom at this Jail dictated by Wellpath. Elsewhere, Plaintiff discusses another inmate who died

under similar circumstances. Doc. 1, ¶ 3; Doc. 29, at 6.

There are also repeated allegations regarding failures to train in Count III. Although

liability has been rare, a plaintiff may proceed under a failure-to-train theory to impose *Monell*

liability. *Flores v. City of S. Bend*, 997 F.3d 725, 731 (7th Cir. 2021) (citing *Connick v.

Thompson*, 563 U.S. 51 (2011); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)

(holding inadequate police training may serve as the basis for § 1983 liability "where the failure

to train amounts to deliberate indifference to the rights of persons with whom the police come

into contact")). Once deliberate indifference is established, the failure to train is considered the

defendant's "policy or custom." *Id*. It "does not require proof of widespread constitutional

violations before that failure becomes actionable; a single violation can suffice where a violation

occurs and the plaintiff asserts a recurring, obvious risk." *Id*.

At the pleading stage, Plaintiff must sufficiently plead that Wellpath caused the

constitutional violation and acted with "deliberate indifference" or "criminal recklessness." *See

id.* at 729-731. "It is enough to plead plausibly 'that the defendant had actual knowledge of

impending harm which he consciously refused to prevent.'" *Id.* at 731. In *Flores*, the Seventh Circuit reversed the district court and found the plaintiff's failure-to-train allegations were sufficient to survive a motion to dismiss. *Id.* at 729. There, the plaintiff alleged the city of South Bend acted with deliberate indifference by failing to address officers' known history of recklessly speeding. *Id.* at 731. *See also J.K.J. v. Polk County*, 960 F.3d 367 (7th Cir. 2020); *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917 (7th Cir. 2004)). In *Woodward*, the court upheld the theory that the correctional facility failed to train its employees on suicide prevention, which resulted in an inmate death, even though no other inmates had lost their lives because of the training failure. *Id*.

Here, Plaintiff alleges Wellpath failed to train "medical staff at the Tazewell County Jail, in necessary circumstances, [to] make a referral for health care services outside the Jail"; failed to train "correctional and medical staff [to] adequately communicate and document inmates' deteriorating mental and medical health conditions"; and failed to train "correctional and medical staff [to] properly respond to inmates' deteriorating mental and medical health conditions." Doc. 1, ¶ 99(e)-(g). For factual support, Plaintiff identifies a prior inmate who died under similar circumstances and Wellpath's failure to take corrective action thereafter. With respect to Ms. Seybold and the individual Defendants, or potentially Wellpath itself, the Complaint discusses a span of nine hours between her intake at the Jail and time of her passing away with various allegations that staff ignored the overdose or withdrawal symptoms she was displaying. These allegations connect the training failures to Ms. Seybold's death. In considering the above cases from the Seventh Circuit and accepting Plaintiff's well-pleaded allegations as true, such allegations support an inference of deliberate indifference.

Based on the above, the Parties' disagreement as to whether Plaintiff sufficiently pleaded a final policy maker claim is not at issue at this stage where Defendant seeks dismissal of Count III in its entirety. While Defendant may need to refute the differing bases for *Monell* liability, Plaintiff needs only to sufficiently plead one theory (i.e., express municipal policy, widespread custom, or deliberate act by a policymaker) to keep her *Monell* claim alive. At minimum, Plaintiff clearly alleges Wellpath, as an entity, has policymaking authority on the issues raised in the Complaint and through those policies or lack thereof, it caused a constitutional deprivation. Plaintiff is entitled to further flush out her *Monell* theories in discovery.

### B. Count VI - Negligent Hiring and Retention

As cited by the Parties, in Illinois, to recover for the employer's breach of its duty to reasonable hire, supervise, and retain their employees, "a plaintiff must prove that: (1) the defendant-employer knew or should have known that an employee had a particular unfitness for his position so as to create a danger of harm to third persons; (2) that such particular unfitness was known or should have been known at the time of the hiring, retention, or failure to supervise; and (3) that this particular unfitness proximately caused the plaintiff's injury." Doc. 29, at 11 (citing *Anicich v. Home Depot U.S.A., Inc.*, 852 F.3d 643, 646 (7th Cir. 2017), *as amended* (Apr. 13, 2017)); Doc. 25, at 5 (citing *Van Horne v. Muller*, 185 Ill.2d 299, 299 (1998)). The particular unfitness of the employee "must have rendered the plaintiff's injury foreseeable to a person of ordinary prudence in the employer's position." *Van Horne*, 185 Ill. 2d at 313. Wellpath argues Plaintiff has failed to allege a particular "unfitness" of any of Wellpath's employees prior to hiring or retaining those employees. Doc. 24, at 5-6. In her brief, Plaintiff argues the death of a previous inmate demonstrates Wellpath hires, trains, and retains employees with an "extreme unfitness" as caretakers. Doc. 29, at 14.

On the issue of negligent hiring, the Complaint alleges Wellpath breached its duty of care to reasonably hire employees that were responsible for providing care to Ms. Seybold and acting in accordance with the law. Doc. 1, ¶ 122. Plaintiff's brief provides better clarity by emphasizing Defendant failed to hire staff with knowledge of drug overdose symptoms. These are sufficient to put Defendant on notice of the grounds for Plaintiff's negligent hiring claim. *See Pegram v. Herdrich*, 530 U.S. 211, 230 (2000) (noting a court may consider a plaintiff's brief which clarifies allegations in her complaint whose meaning is unclear); *see also Early v. Bankers Life & Cas. Co.*, 959 F.2d 75, 79 (7th Cir. 1992) ("[A] plaintiff is free, in defending against a motion to dismiss, to allege without evidentiary support any facts he pleases that are consistent with the complaint, in order to show that there is a state of facts within the scope of the complaint that if proved (a matter for trial) would entitle him to judgment.").

Plaintiff has also stated a plausible claim for negligent retention. In applying *Twombly* and *Iqbal*, a plaintiff is required "provide some specific facts" to support the claims in her complaint. But "[t]he degree of specificity required is not easily quantified." *McCauley v. City of Chicago*, 671 F.3d 611, 616–17 (7th Cir. 2011) (citing *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010)). "The required level of factual specificity rises with the complexity of the claim" such that plaintiff must at least give enough details 'to present a story that holds together.'" *Id.* at 616–17 (quoting *Swanson*, 614 F.3d at 404–05).

Here, Plaintiff points to another inmate who died under similar circumstances at the same jail due to the same alleged failures by at least some of the same Defendants, including failures to render aid and provide continuing education. Doc. 1, ¶¶ 2, 3 (citing *Est. of Jerad Traylor v. Tazewell County, et al.*, No. 18-cv-1309 (C.D. Ill.)). In addition to naming Sheriff Lower and

Wellpath in this Count, Plaintiff names a particular employee of Wellpath, Defendant Williamson, who was a nurse responsible for patient healthcare at the Jail, including Ms. Seybold's treatment. *Id.*, ¶ 37. As indicated in Plaintiff's Response, a review of the complaint in *Traylor* reveals Williamson was, likewise, responsible for patient healthcare at the Jail when Mr. Traylor died in 2017. Doc. 29, at 11–12; *Traylor*, ECF No. 42. ¶¶ 1, 16. *Traylor* also named Tazewell County, the Tazewell County Sheriff, and Wellpath (f.k.a. Correct Care Solutions LLC) as defendants. Of course, *Traylor* contains mere allegations, but they make Plaintiff's Complaint here more plausible with respect to some of her claims as they are factually similar cases involving overlapping defendants and policies at issue at the same Jail.

In her Complaint, Plaintiff also alleges Williamson was responsible for carrying out the policies and procedures for healthcare and she agreed to accept Ms. Seybold into the Jail in her medical condition at the time. Doc. 1, ¶¶ 37, 50. Williamson ignored the signs of overdose Ms. Seybold exhibited and failed to order necessary emergency medical care before leaving for the day. *Id.*, ¶¶ 53, 58. *See also id.*, ¶¶ 112–115 (charging Williamson with failing to adequately evaluate Ms. Seybold and refer her for medical treatment, which resulted in her wrongful death). Coupling the complaints, here and in *Traylor*, Plaintiff has sufficiently pled the foreseeability requirements for a negligent hiring claim despite Wellpath's contention otherwise.

## III.    *Defendant HIG's Motion*

Plaintiff seeks to "pierce the corporate veil" and hold Defendant HIG liable for Wellpath's actions because of the level of control HIG allegedly maintains over Wellpath. Doc. 30, at 6. In its Motion, HIG asks the Court to dismiss Plaintiff's claims against it because she failed to plead adequate facts to support holding HIG responsible for Ms. Seybold's death. Doc.

21, at 4.[3] In her Response, Plaintiff states the test to determine individual or entity liability under a piercing of the corporate veil theory in Illinois. The plaintiff must establish: (1) that "there is such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist," and (2) that the "circumstances are such that adhering to the fiction of a separate corporate existence would promote injustice or inequity." Doc. 30, at 6 (citing *Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 736 (7th Cir. 2004)). Plaintiff contends she has made sufficient allegations that plausibly infer HIG has an alter ego or agency relationship with Wellpath. In the alternative, Plaintiff asserts theories of joint venture and ratification.

## A. Plaintiff's Complaint and the Parties' Briefs

Regarding HIG and its place in the lawsuit, the Parties' briefs, in particular Plaintiff's, often misstate or overstate the allegations in the Complaint. Similarly, there are many instances where Plaintiff provides contradictory or inconsistent articulations of her theories of liability, such as whether HIG "owns" Wellpath and what her definition of "ownership" is here. The Court has done its best to ascertain the Parties' positions and note the significant instances where their positions internally vary. In its Motion, HIG maintains it is a global private equity firm and investment manager that manages investments in companies, makes investments on behalf of limited partnership private equity funds, and performs oversight on these companies. Doc. 21, at 1. According to HIG, it does not invest in or own any of its portfolio companies, including the

---

[3] HIG also urges the Court to reach the same conclusion as two other district courts that rejected theories of alter ego, agency, and color of law alleged by different plaintiffs to hold HIG liable for inmate deaths at other jails. Doc. 21, at 3 (citing *Est. of Ricardez v. Cty. of Ventura*, 2020 WL 3891460 (C.D. Cal. June 24, 2020); *Bible-Marshall, et al. v. Montgomery County, et al.*, No. 4:20-cv-00028, ECF Doc. # 47 (S.D. Tex. September 20, 2020)). Likewise, Plaintiff provides a case from a district of California where HIG was sued under similar theories, but the district court denied its motion to dismiss. Doc. 30, at 3 (citing *Est. of Miller v. Cty. of Sutter*, No. 220CV00577KJMDMC, 2020 WL 6392565 (E.D. Cal. Oct. 30, 2020). Notably, Plaintiff cites *Miller* but does not explain its factual similarity or the allegations therein as compared to the Complaint here, nor does she explain why the Court should follow that court's rationale. The Court considered these opinions but did not rely on them in rendering its decision.

ones involved in this case. *Id*.[4] In contrast, the introduction of Plaintiff's Response begins by stating HIG is a private equity firm that has created a monopoly in the marketplace of jail medical care because it determined that providing medical and mental health care in jails was financially lucrative. Doc. 30, at 1. Thereafter, Plaintiff claims HIG is far from a "mere equity sponsor and investment manager" but rather HIG owned and controlled Wellpath. *Id.* at 2. Wellpath acted with the authorization and knowledge of HIG when it contracted with the Jail to provide healthcare. *Id*. Therefore, Defendants collectively endangered Ms. Seybold's life, which led to her death that could have been prevented if Defendants sent her to an outside facility for a higher level of care. *Id*.

Plaintiff's Complaint and her Response paint conflicting pictures as to what Plaintiff alleges HIG to be. As HIG emphasizes, Plaintiff cannot amend her pleadings through her opposition brief to a motion to dismiss. Doc. 33, at 1 (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)). However, a complaint must be construed generously on a motion to dismiss and a court may consider a plaintiff's brief which clarifies allegations in her complaint whose meaning is unclear. *Pegram*, 530 U.S. at 230; *Early*, 959 F.2d at 79; *see also Heng v. Heavner, Beyers & Mihlar, LLC*, 849 F.3d 348, 354 (7th Cir. 2017) (reiterating the materials or elaborations in the opposition brief must be consistent with the pleadings). Aside from Rule 9(b), the federal rules do not require fact pleading and "ambiguities in complaints in federal court should be interpreted in favor of plaintiffs, not defendants." *Early*, 959 F.2d at 79.

Based on the cases cited above, Plaintiff is not foreclosed from adding additional facts in her opposition brief. However, Plaintiff's Response is riddled with facts not alleged in her Complaint. Some of them could be construed as consistent with the Complaint while others

---

[4] But at this stage, the Court must accept Plaintiff's well-pleaded facts as true, not Defendant's.

could not. Because of the volume of additional facts, the Court is not going to address them one-by-one and conclude whether they are "consistent" or "inconsistent" with the Complaint. The Court will, however, discuss them where relevant to the Court's holding. For example, the Complaint alleges HIG acquired the companies that eventually became Wellpath and HIG owns Wellpath. Doc. 1, ¶ 19, 21. Yet, the article Plaintiff cites in her Complaint to support this proposition states "one of HIG's affiliates" rather than HIG itself acquired CCS in 2018 and merged it with CMGC (which eventually became Wellpath). *See id.*, ¶ 26 n.1. Paragraph 24 of the Complaint states, "H.I.G.'s use of Wellpath is but a mere shell, an instrumentality or conduit for the business of financially profiting from providing mental/medical care to detainees in jails through these shell companies." It would be a stretch to find Plaintiff's brief is consistent with the Complaint. Her Response now concedes it was HIG's affiliate who acquired Wellpath but claims Paragraph 24 alleges "shell companies" are called "affiliates," which HIG creates to conceal or confuse its identity so as to unfairly insulate owners and their assets from liability. Doc. 30, at 5. Therefore, HIG's "affiliate" who acquired Wellpath, is actually HIG but concealed as an "affiliate." These are much different assertions than the Complaint. Notably, Plaintiff does not name the "affiliate" or allege HIG is the alter ego of this unnamed affiliate.

As another example, the Complaint does not allege HIG controls Wellpath's finances, yet the Response adds HIG is in charge of the financial governance of Wellpath; therefore a litany of plausible inferences can be made. *Id.* at 3. These go beyond the scope of being consistent with the Complaint. Even so, Plaintiff does not connect these new allegations to the policies at the Jail or allege Wellpath is financially dependent on HIG.

**B. Analysis of Plaintiff's Theories**

Before addressing the merits of Plaintiff's theories for piercing the corporate veil, the Court first notes the individual Counts in the Complaint do not distinguish between HIG and Wellpath. For example, Plaintiff names HIG in Counts III, V, and VI but only discusses the conduct of Wellpath specifically. The only part of the Complaint addressing HIG is the allegations in the "Parties" section of the Complaint where Plaintiff describes the relationship between HIG and Wellpath generally. Plaintiff's Response clarifies that she relies on the alter-ego and/or agency theories in each count such that Defendants HIG and Wellpath are treated as one in the same with respect to the allegations against them.

"In Illinois, piercing of the corporate veil on an alter ego theory is available only where failing to provide such relief would promote injustice or inequity." *Int'l Fin. Servs. Corp*, 356 F.3d at 737. Illinois courts are generally reluctant to pierce the corporate veil; therefore, the party asserting the doctrine has the burden of "making a substantial showing that the entities are not separate and distinct," or "that the corporation is really a dummy or sham for another dominating entity." *Benzakry v. Patel*, N.E.3d 1116 (Ill. App. Ct. 2017); *Jacobson v. Buffalo Rock Shooters Supply Inc.*, 664 N.E.2d 328, 331 (Ill. App. Ct. 1996); *In re Estate of Wallen*, 633 N.E.2d 1350 (Ill App. Ct. 1994). Where this equitable doctrine has been applied, it has been "almost exclusively in closely held corporations." *Buckley v. Abuzir*, 8 N.E.3d 1166 (Ill. App. Ct. 2014). In reviewing Plaintiff's theories, the Court has afforded Plaintiff every benefit of the doubt but has not found an adequate reason to justify piercing the corporate veil based on the Complaint or opposition brief. Her theories simply do not meet the requirements of Rule 12(b)(6), at this time.

1. **Alter Ego**

The Parties devote most of their argument on these issues to the theory of alter ego

liability and agree that Illinois law applies. Doc. 21, at 10; Doc. 30, at 7. To invoke alter ego

liability, two requirements must be met: first, there must be such unity of interest that the

separate personalities of the corporation and the parties who compose it no longer exist; and,

second, circumstances must be such that adherence to the fiction of separate corporate existence

would sanction a fraud or promote injustice. *Saletech, LLC v. E. Balt, Inc.*, 2014 IL App (1st)

132639, ¶ 27 (affirming dismissal of alter ego claims for lack of factual support); *Wachovia Sec.,*

*LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751-52 (7th Cir. 2012). As to the first prong, no

single factor is determinative but Illinois courts consider the following to determine whether a

unity of interest and ownership exists: "inadequate capitalization; failing to issue stock; failing to

observe corporate formalities; failing to pay dividends; corporate insolvency; nonfunctioning

corporate officers; missing corporate records; commingling funds; diverting assets to an owner

or other entity to creditor detriment; failing to maintain an arm's-length relationship among

related entities." *Wachovia Sec.*, 674 F.3d at 752 (citing *Fontana v. TLD Builders, Inc.*, 840

N.E.2d 767, 778 (2005); *In re Estate of Wallen*, 633 N.E.2d at 1357).

Plaintiff lists the above factors but fails to address any of them. Instead, in a conclusory

fashion, Plaintiff states she has pled HIG and Wellpath communicate regularly regarding key

aspects of Wellpath's business operations and HIG dictates matters including general operations

planning, executive, and management. Doc. 30, at 8 (citing a Doc. 1, ¶¶ 19, 22-23, 30-31). Yet,

all[5] of these allegations, like others in the Complaint, contain mere legal conclusions reciting

elements of alter ego and agency theories like "[t]here is unity of interest and ownership such

---

[5] Aside from ¶ 19 which does not appear relevant as it discusses Wellpath's responsibility for the hiring, retaining, training, and supervising of the conduct, policies and practices of its employees and agents of the Wellpath.

that the separate personalities of H.IG. and WELLPATH no longer exist" and "WELLPATH is a mere agent or instrumentality of H.I.G." *See* Doc. 1, ¶¶ 22-24, 30-31, 33-34. Legal conclusions in a Complaint can assist in providing a roadmap for Plaintiff's claims, but she has not added sufficient allegations to present a plausible story as to how HIG is the alter ego of Wellpath or Wellpath is acting as its agent.

Plaintiff also contends HIG and Wellpath share[6] officers and directors, which is a factual assertion. *Id.* (citing Doc. 1, ¶ 35). Even so, merely sharing directors, office staff, or even office space does not suggest that Wellpath is a mere instrumentality of HIG, nor does it indicate some fraud or injustice. *Hornsby v. Hornsby's Stores, Inc.*, 734 F. Supp. 302, 308 (N.D. Ill. 1990) (citing *Sumner Realty Co. v. Willcott*, 499 N.E.2d 554, 557 (Ill. App. Ct. 1986) ("The separate corporate entities of two corporations may not be disregarded merely because one owns the stock of another or because the two share common directors or occupy the same office space.")). To the extent Plaintiff claims in a conclusory fashion that HIG controls, manages, and approves major policy decisions of Wellpath, she does not provide any indication as what sort of "major" policies HIG approves or connect them to policies applied at the Jail or any other correctional facility. *See* Doc. 1, ¶ 36.

Plaintiff also points to allegations which are simply not relevant to this inquiry, such as a quote from Wellpath's CEO acknowledging that the company has seen an increase in individuals with acute mental health diagnoses and substance use disorders. *See Id.*, ¶¶ 27-29. That HIG determined providing mental health care in jails was financially lucrative does not justify

---

[6] As HIG points out, the paragraph Plaintiff cites for this proposition does not state HIG and Wellpath share officers. However, it does state "H.I.G. places its senior partner and/or members on the boards or managing bodies of WELLPATH to maintain a high degree of day-to-day control over WELLPATH's activities." *Id.*, ¶ 35.

piercing the corporate veil. *See Id.*, ¶ 24. The same accusation could be said of any entity that makes a profit while serving a vulnerable population, i.e., many facets of the healthcare industry.

The second prong of the alter ego test requires "something less than an affirmative showing of fraud[7]," but "something more than the mere prospect of an unsatisfied judgment." *Wachovia Sec.*, 674 F.3d at 756 (quoting *Sea–Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 522–23 (7th Cir. 1991)). Although Plaintiff alleges Wellpath shields HIG from the liabilities of providing jail mental and medical healthcare, Plaintiff has not even inferred that Wellpath would not have sufficient assets to pay a judgment in this case or the shield would be accomplished fraudulently. *See* Doc. 1, ¶¶ 26, 30. Even so, "[t]he prospect of an unsatisfied judgment looms in every veil-piercing action; why else would a plaintiff bring such an action? Thus, if an unsatisfied judgment is enough for the 'promote injustice' feature of the test, then every plaintiff will pass on that score[.]" *Sea-Land Servs.*, 941 F.2d at 522–23. In such a scenario, alter ego liability in Illinois would collapse into a one-step "unity of interest and ownership" test. *Id.* In *Sea-Land*, the Seventh Circuit found that an unsatisfied judgment is not enough to meet the "promoting injustice" requirement under the two-part test in Illinois.

> Generalizing from these [Illinois] cases, we see that the courts that properly have pierced corporate veils to avoid "promoting injustice" have found that, unless it did so, some "wrong" beyond a creditor's inability to collect would result: the common sense rules of adverse possession would be undermined; former partners would be permitted to skirt the legal rules concerning monetary obligations; a party would be unjustly enriched; a parent corporation that caused a sub's liabilities and its inability to pay for them would escape those liabilities; or an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation would be successful.

*Id.* at 524.

---

[7] Although it does not appear to have been squarely addressed by the Seventh Circuit, the Court does not believe the second prong of corporate veil piercing is subject to the requirements in Rule 9(b) requiring particularity for allegations of fraud. Other district courts agree. Moreover, the language quoted by the Seventh Circuit here supports the Court's view. See *Wachovia Sec.*, 674 F.3d at 756.

Here, Plaintiff contends Defendants will "avoid accountability for their actions and omissions in the provision of medical care to vulnerable pre-trial detainees in county jail, all while expanding their enterprise and geographic scope," HIG has already eluded congressional oversight,[8] and Wellpath and HIG will continue "their unconstitutional conduct toward vulnerable inmates in their care." Doc. 30, at 9-10. Plaintiff's defense to the sufficiency of her Complaint is vague. It is unclear what unconstitutional conduct HIG, as opposed to Wellpath, is alleged to have committed. The allegation that "before acquiring CCS through joining other correctional healthcare companies, and renaming them WELLPATH, H.I.G. knew or should have known of the pervasive unconstitutional conduct of these companies" suggests that these policies were already in place prior to HIG's alleged acquisition. *See* Doc. 1, ¶ 24. At the same time, the Complaint does not provide notice of the "unconstitutional policies" to which HIG had knowledge of but failed to address. It states that HIG approved "major" policy decisions but not that it approved Wellpath's unconstitutional policies alleged here. Elsewhere, the fact that an HIG Principal is a Chief Financial Officer and Secretary of Wellpath who has *access and power to influence* the policies and procedures of Wellpath does not mean he enacted the policies at issue. Doc. 30, at 2. It is also unclear how dismissing HIG would allow Wellpath, who is still a Defendant, to continue their unconstitutional conduct as Plaintiff contends. Plaintiff does not allege Wellpath cannot change its policies or conduct if HIG is dismissed from this lawsuit. Thus, the Complaint and Response fail to provide a roadmap to a plausible claim that an inequitable result would occur if the Court declines to pierce the corporate veil here.

---

[8] The article cited by Plaintiff discusses Senator Elizabeth Warren's efforts to investigate private equity firms, including HIG, so the Court is unclear as to why Plaintiff cites it for the proposition that HIG is evading congressional review or the alleged evasion is relevant here. The article does not discuss the status of the proposed "Stop Wall Street Looting Act." Even if this bill has not passed, for any variety of reasons, it does not necessarily mean HIG has eluded congressional oversight. If anything, this article demonstrates federal courts are not the appropriate forum for a referendum on private equity firms.

## 2. Agency

As indicated by Plaintiff, the test for establishing an agency relationship in Illinois is "whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal." *Id.* at 6 (citing *Chemtool, Inc. v. Lubrication Tech., Inc.*,148 F.3d 742, 745 (7th Cir. 1998)). Plaintiff then describes the concept of actual authority and apparent authority. *Id.* (citing *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000)). The Court need not describe further aspects of the analysis because Plaintiff fails to explain *how* Wellpath acted with actual or apparent authority.

After citing the agency test, Plaintiff makes a conclusory statement that "HIG controls the manner in which Wellpath conducts its business." Doc. 30, at 6-7. She does not provide anything further to support this remark expect that the two companies "share officers and directors." Plaintiff's brief also fails to cite the allegations in her Complaint to which she is referring. Assuming Plaintiff's new allegation in her brief is consistent with her Complaint, the mere sharing of officers does not present a plausible story that HIG has the right to control the manner and method of the work is carried out by Wellpath. *Chemtool*,148 F.3d at 745. Nor does Plaintiff pinpoint which "work" she is referencing (Is it all of Wellpath's activities? Only inmate care? Only the Wellpath contract with Tazewell?). Plaintiff's argument for an agency relationship does not discuss at all how she has pled anything to suggest Wellpath can affect the legal relationships of HIG, which is the second part of the test. Thus, the Court is left with a vague conclusion discussing only the first part of the analysis for establishing an agency relationship, which is insufficient to cross the threshold from conceivable to plausible to satisfy Rule 12(b)(6).

### 3.  Color of Law

As to the color of law test, Plaintiff waivers in whether she alleges that HIG itself entered into a contractual agreement with the Jail or whether Plaintiff's assertion that HIG acted under the color of law solely rests on her winning her alter-ego or agency arguments. On page 14 of her brief, Plaintiff first states, "it is undisputed that Wellpath and HIG freely entered into a contract with Tazewell County." Doc. 30. On the same page, she then remarks "Wellpath with the approval of HIG entered into a contract with Tazewell . . . Wellpath is a mere shell for HIG." Thus, it is unclear how Plaintiff claims the contractual relationship between HIG and the Jail was established. Based on the allegations in Plaintiff's Complaint including the minimal discussion of HIG's specific actions, and her Response brief overall, the Court assumes Plaintiff concedes that her color of law argument fails if her theories as to alter-ego and agency fail. *See id.* ("All of the factors above weigh in favor of finding that HIG through its alter-ego and agent, Wellpath, is acting under the color of state law . . ."). As discussed above, Plaintiff has not sufficiently alleged an alter ego or agency relationship between HIG and Wellpath. Therefore, Plaintiff's argument that HIG acted under the color of law likewise fails.

### 4.  Joint Venture and Ratification

In HIG's Reply, it notes the Court cannot consider Plaintiff's theories of joint venture and ratification because neither theory was included in her Complaint. Doc. 33, at 5 (citing *Carr Carriers, Inc.*, 745 F.2d at 1107; *Scibetta v. Rehtmeyer, Inc.*, 2005 WL 331559, at *2 (N.D. Ill. Feb. 9, 2005). "Yet complaints need not set out either legal theories or comprehensive factual narratives." *Rapid Test Prod., Inc. v. Durham Sch. Servs., Inc.*, 460 F.3d 859, 860 (7th Cir. 2006). The Court has chosen to disregard Plaintiff's theories of joint venture and ratification, not because she did not allege these theories in her Complaint, but because the Parties have not

developed these arguments enough for the Court to make a determination at this time. The
Parties devote little attention to these issues in their briefs. Additionally, many of Plaintiff's
allegations in her Response are vague or inconsistent with her Complaint making the Court's
analysis difficult.

        In conclusion, HIG's Motion to dismiss is granted. However, if facts are elicited during
discovery that would warrant adding HIG as a proper Defendant in this case, Plaintiff may seek
leave to do so. Because Plaintiff has not sufficiently pled a theory to hold HIG responsible for
Wellpath's actions or that HIG acted under the color of law, the Court need not address the merits
of Plaintiff's *Monell* claim, state law wrongful death claim, and state law claims for negligent
supervision, training, hiring, and retention against HIG. The Court's analysis with regard to
Wellpath still stands and it will remain in this litigation at this time. Therefore, Wellpath's
Motion to dismiss is denied. Based on the Parties' agreement, Defendant Lower's partial Motion
to dismiss is granted. Defendant Tazewell County also remains as a Defendant in this action
joined pursuant to *Carver v. Sheriff of LaSalle County*, 324 F.3d 947 (7th Cir. 2003). Thus, at this
time the following Counts remain as to these named Defendants:

- Count I against Defendant Sheriff Jeffrey Lower.

- Count II against Defendants Bryce Colvin, Aaron Hoffman, Marissa Hutton, Kara Toel,
  and Hannah Williamson.

- Count III against Defendant Wellpath only; Defendant HIG has been dismissed.

- Count IV against Defendant Sheriff Jeffrey Lower.

- Count V against Defendant Wellpath only; Defendant HIG has been dismissed.

- Count VI in its entirety against Defendant Wellpath and against Defendant Lower only for negligent supervision and training; Defendant HIG has been dismissed and the claims for negligent hiring and retention against Defendant Lower have been dismissed.

## CONCLUSION

For the reasons set forth above, Defendant H.I.G. Capital, LLC's Motion (Doc. 21) to Dismiss is GRANTED, Defendant Sheriff Jeffrey Lower's Partial Motion (Doc. 23) is GRANTED, and Defendant Wellpath's (f/k/a Correct Care Solutions LLC) Partial Motion (Doc. 24) to Dismiss is DENIED. The Clerk is directed to terminate H.I.G. Capital, LLC as a Defendant in this case.


Signed on this 6th day of January, 2022.

<u>s/James E. Shadid</u>
James E. Shadid
United States District Judge